UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
5:06-CR-313-FL

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | **MEMORANDUM AND** |
| ) | **RECOMMENDATION** |
| HOPETON FRANK GOODEN, ) | |
| a/k/a MICHAEL FRANK BURKE, ) | |
| a/k/a RICHARD DOLESON, ) | |
| ) | |
| Defendant. ) | |

This case comes before the court on motion by defendant Hopeton Frank Gooden ("defendant") to suppress all evidence obtained as a result of the search of defendant's vehicle on 1 June 2006 [DE #18-1]. The government filed a response in opposition [DE #21-1]. The motion was referred to the undersigned Magistrate Judge for memorandum and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). On 12 April 2007, the undersigned held a hearing on the motion. For the reasons stated below, defendant's motion should be denied.

## I. PROCEDURAL BACKGROUND

On 13 December 2006, defendant was charged in a two-count indictment [DE #1] with being an illegal alien in possession of firearms in violation of 18 U.S.C. §§ 922(g)(5) and 924 and possession with the intent to distribute a quantity of marijuana in violation of 21 U.S.C. § 841(a)(1). On 14 February 2007, a superceding indictment [DE #14] was filed charging defendant, in addition to the two counts in the original indictment, with being a felon in possession of firearms in violation of 18 U.S.C. §§ 922(g)(1) and 924 and illegal reentry into the United States in violation of 8 U.S.C. § 1326. The charges arise from the disputed search of 1 June 2006.

## II. FACTUAL BACKGROUND[1]

### A. The Traffic Stop

On 1 June 2006, at approximately 7:20 a.m., while traveling on I-95 in Johnston County, North Carolina, defendant's vehicle was stopped by North Carolina State Trooper Anthony DiGiovanni ("DiGiovanni"). (Transcript of Hearing ("Tr.") 8, 11). DiGiovanni testified that he observed defendant driving at approximately seventy-five miles per hour in a sixty-five mile per hour zone and changing lanes in a dangerous manner, nearly causing a collision with another driver. (*Id.* 8-9). Defendant disputes that he was speeding or driving in an unsafe manner. (*Id.* 65-66).

Once the patrol car stopped, the dashboard video and audio camera ("Video") in it were automatically activated.[2] (Tr. 23-24). DiGiovanni approached defendant's vehicle and, after a few seconds of initial conversation which was not audible on the Video (Video, 07:22:05), stated, "You almost wrecked that car back there that you cut off in front of" (*id.*, 07:22:36). Defendant alleges that during the inaudible portion of the Video, DiGiovanni also asked him if he was Rastafarian and where DiGiovanni could get "good weed." (Tr. 67). DiGiovanni denies these statements. (*Id.* 27).

Upon request, defendant produced a Jamaican driver's license and a one-way rental car contract. (*Id.* 9-10). The license was in the name of "Michael Burke." (*Id.* 69, 79; Police Report, p. 1). At some point after defendant's arrest, law enforcement determined that this name was an alias

---

[1]The court bases its factual determinations on the testimony and single exhibit admitted at the hearing, and the exhibits accompanying the motion and the opposing memorandum.

[2] Throughout the entire Video, the upper right corner of the screen contains a running clock showing the time of day to the second in the format 07:__:__. A copy of the Video [DE #21-3] was submitted as Exhibit 2 to the government's memorandum. The citations to the Video in this Memorandum indicate the approximate time on the clock at the beginning of the event referenced. According to the clock, the Video covers the period from 07:21:51 to 08:09:44 and therefore lasts approximately 47 minutes and 35 seconds.

2

Case 5:06-cr-00313-FL Document 28 Filed 05/09/07 Page 2 of 20

for defendant.[3] Defendant admitted at the hearing that "Michael Burke" was one of several aliases he used. (Tr. 79, 84).

After receiving defendant's driver's license and the rental agreement, DiGiovanni asked defendant to exit his vehicle and accompany him back to the patrol car, where defendant sat in the front passenger seat. (*Id.* 10; *see* Video, 7:22:35). DiGiovanni was driving a canine unit and a narcotic detection canine occupied the back seat area. (Tr. 10, 33). Defendant argues in his motion that the patrol car was locked while he was seated inside (Def.'s Mot., p. 3), but offered no testimony at the hearing on this issue. DiGiovanni testified that the patrol car was unlocked. (Tr. 10).

While inside the patrol car, DiGiovanni conversed with defendant, asking defendant about his age and where he was traveling to and from. (Video, 07:24:26). Defendant took approximately ten seconds to give the address where he had been staying in New York City for the past six weeks (*id.*, 07:26:30) and four seconds to state his age (*id.*, 07:27:06). DiGiovanni stated in his report that during this exchange defendant's breathing pattern was rapid and shallow, his carotid artery was pounding, and he seemed unusually nervous. (Police Report, p. 1; *see* Tr. 43).

While reviewing defendant's identification, DiGiovanni noticed that defendant's signature on the Jamaican driver's license did not include his middle name, the information on the license appeared off-center, defendant's vehicle had been rented by someone else with defendant listed as an additional driver (presumably under the name Michael Burke), and the rental was for a one-way trip to Myrtle Beach, South Carolina. (Police Report, p. 1; *see* Tr. 15, 32, 51). After filling out a

---

[3] Defendant was originally indicted under the name Michael Frank Burke. However, the superceding indictment indicates that defendant's name is Hopeton Frank Gooden, and lists the name Michael Frank Burke as an alias.

3

warning ticket, DiGiovanni handed it to defendant along with his rental car agreement and license. (Police Report, p. 1).

## B. Post-Ticketing Conversation

Defendant then asked DiGiovanni where the nearest rest area was located. (Video, 07:30:59). Although DiGiovanni did not specifically answer defendant's question, he and defendant engaged in brief conversation regarding defendant's travel plans. (*Id.*, 07:31:04). DiGiovanni next asked defendant whether he had weapons, drugs, or more than $10,000 in cash in his vehicle. (*Id.*, 07:31:33). After defendant replied that he did not have any of those items in his vehicle (*id.*, 07:31:34), DiGiovanni told defendant that he wanted to search the car and that it would take only a few minutes (*id.*, 07:31:51). DiGiovanni further explained that he did not want defendant "to feel picked on" (*id.*, 07:32:01) and that post 9/11 "I wouldn't be doing my job if I didn't ask" to search (*id.*, 07:32:15). Defendant responded "Okay" three times to these statements, inquiring the last time about the document DiGiovanni was at that point showing him. (*Id.*, 07:32:00, 07:32:10, 07:32:20).

DiGiovanni explained that the document was a written consent to search form that defendant could refuse. (*Id.*, 07:32:22). DiGiovanni stated that he was looking for defendant's assistance (*id.*, 07:32:27) and again told defendant that he had the right to refuse (*id.*, 07:32:31). In response to these various statements, defendant replied either "Okay" or "Right," but he did not sign the form. (*Id.*, 07:32:26; 07:32:30; 07:32:35; 07:32:37).

DiGiovanni then sought clarification that, although defendant did not want to sign the written consent, he still had defendant's verbal consent to search. (*Id.*, 07:32:40). Defendant responded initially, "Okay, well you can do it, but still, I just." (*Id.*, 07:32:48). DiGiovanni again told him he

4

did not have to sign and asked if defendant was giving him verbal consent. (*Id.*, 07:32:50). Defendant replied, "Yeah, well, what did I do wrong, though?" (*Id.*, 07:32:57).

DiGiovanni explained that he wanted to search the vehicle because there were legalities involved and some things about defendant that seemed out of the ordinary based on his twenty years of experience in law enforcement. (*Id.*, 07:33:01). After responding "Okay" several times during this explanation (*id.*, 07:33:05; 07:33:09; 07:33:16; 07:33:17; 07:33:20), defendant stated, "I have no problem. I just feel like I'm being profiled." (*Id.*, 07:33:24). DiGiovanni explained that defendant was not being profiled (*id.*, 07:33:29) and told defendant that "the choice is up to you" whether to consent to the search (*id.*, 07:33:50). Defendant responded with "Okay" several times during this explanation. (*Id.*, 07:33:32; 07:33:39; 07:33:55). After concluding his explanation, DiGiovanni asked again whether he could search. (*Id.*, 07:33:56). Defendant replied, "Yeah, well not my food.." (*Id.*, 07:34:00). DiGiovanni assured defendant twice that he would not touch the food, and defendant said, "All right." (*Id.*, 07:34:09). DiGiovanni asked defendant if the keys were in his vehicle, to which defendant responded, "Yes." (*Id.*, 07:34:16).

### C. The Search of Defendant's Car

DiGiovanni then walked to defendant's vehicle and briefly looked inside the driver, passenger, and trunk areas to ensure that there were no dangerous weapons or items that could injure his narcotics detection canine. (*Id.*, 07:34:26; Tr. 18). He then used the canine to search defendant's vehicle. (*Id.*, 07:35:28). The canine alerted to the presence of narcotics in the trunk. (Tr. 19). DiGiovanni placed the canine inside the trunk, and the canine subsequently alerted to the presence of narcotics in all the luggage found in the trunk. (*Id.* 20). DiGiovanni returned the canine to the patrol car (Video, 07:36:13) and began a hand search of defendant's vehicle (*id.*, 07:36:30).

5

Inside the passenger compartment, DiGiovanni found a cardboard drink box with approximately 100 small plastic bags. (Police Report, p. 2; *see* Video, 07:56:53). The trunk of the vehicle contained a black canvas suitcase with a locked padlock on the outside, a large plastic garbage bag secured with duct tape, and a small blue canvas bag. (Police Report, p. 2; *see* Tr. 20). DiGiovanni asked defendant to open the black suitcase. (Video, 07:40:30). After unsuccessful attempts to locate the key spanning about seventeen minutes, including a phone call defendant made to someone (purportedly his wife) to ask about the key (*id.*, 07:49:07), DiGiovanni forced the lock open. (*Id.*, 07:57:26). Inside the black suitcase, DiGiovanni found four firearms, 311 rounds of ammunition, and six magazine clips. (Police Report, p. 2; *see* Video, 07:58:00). Defendant was subsequently handcuffed and placed under arrest. (Video, 07:59:48). The Video ends as DiGiovanni and another officer are preparing to take defendant and his vehicle to the police station. (*See* Video, 08:09:44).

### D. Events After Defendant's Arrest

Once at the police station, DiGiovanni continued his inspection of the luggage. (Police Report, p. 2). A digital scale was found inside the blue canvas bag. (*Id.*, p. 2). Inside the garbage bag secured with duct tape, DiGiovanni discovered a stereo system, which had some loose screws on the back of it. (*Id.*, p. 3). Upon further inspection, DiGiovanni found approximately 250 grams of marijuana inside the stereo. (*Id.*).

DiGiovanni testified that at the police station they engaged in hours of casual discussion about religion, health, and life. (Tr. 40). Although defendant also testified that this conversation took place, he stated that it occurred while he was seated inside the patrol car during the traffic stop.

6

(*Id.* 74). Consistent with DiGiovanni's testimony, neither the Video for this period nor any other portion of the Video contains this alleged conversation.

## III. DISCUSSION

Defendant contends that the search incident to the 1 June 2006 traffic stop was illegal, first, because the stop itself was unlawful. Even if the stop is deemed lawful, defendant argues that he did not validly consent to the search and that probable cause did not exist to otherwise justify the search.

Defendant's contentions are without merit. The court finds initially that the traffic stop was lawful. There are then two alternative theories of the subsequent events that sustain the legality of the search. First, the court finds that defendant gave DiGiovanni valid, voluntary consent to search his vehicle. In the alternative, the court finds that there was reasonable suspicion to support a brief detention of defendant during a narcotics canine sniff, which led to probable cause to search defendant's vehicle. Each of these issues–the validity of the stop, defendant's consent to the search, and, alternatively, probable cause for the search–is addressed in turn below.

### A. Validity of the Traffic Stop

The Fourth Amendment assures individuals of the right to be free from "unreasonable searches and seizures." U.S. Const. amend. IV. A traffic stop constitutes a seizure within the meaning of the Fourth Amendment; accordingly, to be reasonable it must be supported by probable cause that a traffic violation has occurred. *Whren v. United States*, 517 U.S. 806, 810 (1996).

There is conflicting evidence regarding the existence of probable cause for the traffic stop in issue. Defendant testified that on the morning of his traffic stop he was traveling on I-95 en route to Myrtle Beach, South Carolina. (Tr. 65). He was purportedly driving under the posted speed limit of sixty-five miles per hour and other vehicles on the road were speeding past him. (*Id.*). According

7

to defendant, when the driver of the vehicle in front of him slammed on the brakes, defendant swerved into the next lane to avoid a collision. (*Id.* 66). Defendant speculated that the car in front of him slowed abruptly when the driver saw DiGiovanni's patrol car. (*Id.*) Shortly thereafter, defendant was stopped by DiGiovanni. (*Id.*).

DiGiovanni testified that on that morning he was on duty as a North Carolina State Trooper, sitting in his patrol car in the median of I-95 in Johnston County, North Carolina. (*Id.* 8). DiGiovanni saw defendant driving southbound in a red vehicle, in the left lane, at approximately seventy-five miles per hour. (*Id.*). According to DiGiovanni, defendant was passing other vehicles and talking on a cellular telephone. (*Id.*). After defendant drove past DiGiovanni, defendant purportedly changed lanes abruptly, moving to the right lane and almost causing a collision with another vehicle. (*Id.* 9). DiGiovanni testified that he then initiated a traffic stop of defendant's vehicle. (*Id.*).

The court credits DiGiovanni's version of the events preceding the stop. The court finds not credible defendant's claim that he was traveling under the speed limit given other evidence of his efforts to reach his destination as quickly as possible, as discussed below (*e.g.*, traveling through the night and with food).

In addition, DiGiovanni's first audible words on the Video were an exclamation about how defendant nearly caused a collision. (*See* Video, 07:22:36). This statement substantiates DiGiovanni's belief that defendant was driving recklessly.

More generally, the background of DiGiovanni makes his testimony more worthy of belief than defendant's. DiGiovanni has nearly twenty years of experience as a law enforcement officer, with nineteen years as a State Trooper. (Tr. 6-7). In contrast, defendant, according to his own

8

testimony, is a convicted felon[4] (*id.* 83) and has used "aliases" in the past (*id.* 84). Indeed, defendant admitted that the driver's license he produced to DiGiovanni was in the name of an alias. (*Id.* 79).

The events as described by DiGiovanni unquestionably gave him probable cause to believe that defendant had committed multiple traffic violations. These violations include those for which DiGiovanni gave defendant a warning ticket: speeding, unsafe movement, and improper passing. (*See* Warning Ticket [DE #18-3], p. 2). Accordingly, the court finds that DiGiovanni had probable cause to initiate a traffic stop of defendant's vehicle on 1 June 2006.[5]

### B. Defendant's Voluntary Consent to the Vehicle Search

Having found that the traffic stop was lawful, the court now turns to the issue of defendant's consent to the search. The court begins its analysis with an evaluation of the relationship between the parties after defendant received his ticket, in part, because this relationship bears on the voluntariness of defendant's consent. The court then turns to an analysis of the defendant's provision of consent and the voluntariness of such consent.

#### 1. Stop Aftermath as Consensual Encounter

Once a police officer gives a citation to a motorist stopped for a traffic violation and returns the motorist's driver's license and any other paper work given to the officer, the traffic stop is complete. *United States v. Lattimore*, 87 F.3d 647, 653 (4th Cir. 1996). Absent restraint, further

---

[4] Defendant admitted to having a criminal record on direct examination (Tr. 77-78). On cross-examination, he testified that his record included more than one felony, none drug related. (*Id.* 83). There is no evidence in the record regarding the age of defendant's convictions or their nature, other than their not being drug related. Although Federal Rule of Evidence 609 is inapplicable to proceedings on this motion, *see* Fed. R. Evid. 104(a), based on the lack of evidence regarding the age and nature of these convictions, the court has accorded little weight to them in assessing defendant's character for truthfulness.

[5] A finding that a traffic stop was illegal does not necessarily render a search incident to the stop invalid. Fourth Circuit case law supports the notion that valid consent can be given in such circumstances. *See United States v. Boone*, 245 F.3d 352, 363 (4th Cir. 2001). Therefore, under this authority, the search here would be sustainable based on defendant's consent even if the stop had been found unlawful.

9

interaction between the motorist and the police officer is merely consensual. Once the purpose of the traffic stop has been served, "mere questioning by officers, without some indicated restraint, does not amount [to] . . . a seizure under the Fourth Amendment." *United States v. Sullivan*, 138 F.3d 126, 131 (4th Cir. 1998). Further, being seated in the front of a patrol car does not by itself negate the consensual nature of the encounter. *See Lattimore*, 87 F.3d at 649, 653.

In accordance with these authorities, once DiGiovanni gave defendant his warning ticket along with his driver's license and rental car agreement, the traffic stop concluded. Defendant was not then subject to any restraint. Although defendant was in the front passenger seat of DiGiovanni's patrol car, alongside DiGiovanni (Tr. 10), that fact does not demonstrate restraint, especially when the back seat was not available because of the canine. In addition, the court accepts DiGiovanni's testimony that the doors of the car were unlocked. (Tr. 10). The court rejects defendant's contention to the contrary (Def.'s Mot., p. 3), in part, because it is set forth only as argument in his memorandum and is unsupported by any testimony or other evidence. In addition, not only does DiGiovanni have more credibility generally than defendant, there is no indication on the Video that DiGiovanni locked the passenger side door after defendant entered the patrol car. Accordingly, the conversation between defendant and DiGiovanni in the aftermath of issuance of the ticket was a consensual encounter.

The subject matter discussed substantiates the consensual nature of the encounter. Defendant began the consensual conversation by asking DiGiovanni where the closest rest area was located. (Video, 07:30:59). DiGiovanni responded by discussing directions with defendant, as well as stopping for something hot to drink. (*Id.*, 07:31:25). It was only then that DiGiovanni began to ask defendant about the contents of his car and consent to search it. (*Id.*, 07:31:31)

10

### 2. Consent to Vehicle Search

#### a. Applicable Law

Generally, to be reasonable, Fourth Amendment searches must be conducted pursuant to a warrant based on probable cause; however, voluntary consent is a valid exception to the warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). The voluntariness of an individual's consent must be determined by the totality of the circumstances, and no one factor is dispositive. *Id.* at 227. In its determination, the court may "consider the characteristics of the accused (such as age, maturity, education, intelligence, and experience) as well as the conditions under which the consent to search was given (such as the officer's conduct; the number of officers present; and the duration, location, and time of the encounter)." *Lattimore*, 87 F.3d at 650. An individual need not be advised of his right to refuse consent, but lack of knowledge of the right to refuse is one factor that must be weighed. *Schnecklock,* 412 U.S. at 227. Furthermore, following a traffic stop, an individual need not be advised that he is free to leave for his consent to search to be found voluntary. *Ohio v. Robinette*, 519 U.S. 33, 36 (1996).

#### b. Defendant's Provision of Consent

The court finds that defendant gave DiGiovanni express verbal consent to the search of his vehicle during their conversation immediately after the traffic stop ended. (*See* Video, 07:31:51-07:34:17). During much of this exchange, which lasted about three minutes, defendant replied to DiGiovanni with the single word "Okay" or other responses that, although affirmative in tone, could reasonably be interpreted as either mere acknowledgments that he understood what DiGiovanni was saying or inchoate expressions of consent. Indeed, DiGiovanni himself did not appear willing to rely on such responses because he continued to seek defendant's consent after receiving them.

11

Ultimately, however, defendant did unquestionably state his consent. After concluding his various explanations to defendant, DiGiovanni asked, "So do I have your permission to search?" (*Id.*, 07:33:56). Defendant expressed his consent by saying "Yeah, well not my food." (*Id.*, 07:34:00). In this context, the word "Yeah" alone indicates defendant's agreement to the search. Moreover, by placing limits on the search–that is, making the food off-limits–defendant further indicated his consent as well as his knowledge that he could limit that consent. *See United States v. Boone*, 245 F.3d 352, 362 (4th Cir. 2001) (placing limits on search indicates consent). After DiGiovanni twice assured defendant that he would not touch his food, defendant reaffirmed his consent by responding, "All right." (*Id.*, 07:34:09). Defendant reaffirmed his consent again by confirming to DiGiovanni at DiGiovanni's request that the keys were in the car. (*Id.*, 07:34:17).

Although defendant refused to sign a written consent form, such refusal does not necessarily invalidate verbal consent. *See United States v. Thompson*, 876 F.2d 1381, 1384 (8th Cir. 1989) (defendant's verbal consent to search was voluntary, although he refused to sign a consent form); *United States v. Wiggins*, 192 F. Supp. 2d 493, 498 (E.D. Va. 2002) ("That defendant refused to sign a waiver does not preclude a finding of consent."). Defendant's refusal here does not invalidate his verbal consent because, in addition to the other indicia of voluntary consent discussed herein, the verbal consent followed the refusal to sign. *See United States v. Boukater*, 409 F.2d 537, 539 (5th Cir. 1969) (defendant's verbal consent to search was valid where he later refused to sign a written consent because after the refusal he again indicated his verbal consent to search).

Defendant's conduct during the search also indicates his consent. During the search, defendant did not ask DiGiovanni to stop or further limit his search. Additionally, when DiGiovanni

12

encountered the locked black suitcase, defendant did not prohibit DiGiovanni from searching that suitcase and even assisted in the prolonged search for the key.

At the hearing, defendant denied that he gave DiGiovanni consent to search his vehicle (Tr. 65, 76) and, to the contrary, testified that he explicitly told DiGiovanni that he could not search (*id.* 82). Defendant also testified that DiGiovanni told him that he was going to search the vehicle whether or not defendant consented. (*Id.* 76-77). Finally, defendant testified that he told DiGiovanni not to touch his food only because DiGiovanni had indicated that he was going to use his canine to assist in the search. (*Id.* 81).

The Video belies the credibility of this testimony. As indicated, DiGiovanni and defendant discussed consent to search between the time the traffic stop ended at approximately 07:30:59 and the time DiGiovanni stepped out of the patrol car to search defendant's vehicle at 07:34:17. The court finds the Video to be a complete and accurate record of the interaction between DiGiovanni and defendant during this period. The Video shows almost constant talking by either DiGiovanni or defendant during this time, all of which is audible on the Video. In addition, there are no visible breaks in sequence and the clock in the upper right corner runs continuously during this period (as throughout the entire Video). There are no allegations or evidence of tampering with the Video.

Nowhere on the Video for this period do any of defendant's alleged statements appear. Nor do the statements appear on any other portion of the Video. While at the very start of the traffic stop and a few other times the conversation between DiGiovanni and defendant is inaudible, there is no indication from the conversation that was recorded that consent to search was discussed outside the immediate aftermath of the traffic stop. Based on the absence of these alleged statements by

13

defendant in the Video and defendant's lack of trustworthiness, the court finds that defendant did not make the statements he alleges.

Defendant further testified at the hearing that he refused consent because he believed he was being profiled based on his race and appearance–a black male wearing dreadlocks. (Tr. 77). In support of this assertion, he contends that DiGiovanni asked him twice whether he was a Rastafarian, once at the very start of the traffic stop and again in the aftermath of the traffic stop. (*Id.* 75, 77). The court does not find this testimony credible. One reason is that DiGiovanni denies asking defendant these questions. In addition, with respect to the alleged question during the aftermath of the stop, there is no record of it on the Video. Once again defendant alleges a statement that the Video indicates did not occur. Finally, even assuming that DiGiovanni had an ulterior race-based motive in seeking consent to search, it would not invalidate voluntary consent. *United States v. Bullock*, 94 F.3d 896, 899 (4th Cir. 1996) (while subjective motives may be relevant to a race-based equal protection challenge, they are "irrelevant to a proper Fourth Amendment analysis"); *see also Whren*, 517 U.S. at 811, 813 (ulterior motives do not invalidate a search that is justified by probable cause; such motives "play no role in ordinary, probable-cause Fourth Amendment analysis").

### c. Voluntariness of Consent

The circumstances surrounding defendant's consent establish that it was voluntary. As indicated, consent was given during the parties' consensual encounter after DiGiovanni gave defendant the warning ticket. The atmosphere during this period was nonthreatening. (*See* Video, 07:30:59). DiGiovanni did not use force or threats of force to gain defendant's consent. (*See id.*).[6]

---

[6] As discussed, DiGiovanni and defendant continued to converse in a similarly relaxed atmosphere for a lengthy period of time after defendant was taken to the police station. (Tr. 40).

14

The conversation took place during daylight hours while DiGiovanni's patrol car was parked on the shoulder of a well-traveled highway. (*See id.*). During the conversation, there was one other trooper at the scene. However, he was not standing near the patrol car where defendant was seated, and there is no indication that he heard or participated in the conversation between DiGiovanni and defendant. (Tr. 17).

During the consensual conversation, defendant was twice advised that he had the right to refuse consent. In one instance, this admonition was limited to refusal to sign the consent form (Video, 07:32:50); in two instances, the admonition applied to written consent and possibly also to verbal consent (*id.*, 07:32:50); and in the final instance, the admonition clearly covered consent irrespective of format (*id.*, 07:32:40). Defendant acknowledged this right each time by responding with "Okay" (*id.*, 07:32:26; 07:32:35, 07:32:55) or, in one case, "Yeah" (*id.*, 07:32:57). Moreover, defendant admitted at the hearing that he knew from prior experience that he could have refused consent. (Tr. 78, 83).

The characteristics of defendant also substantiate the voluntariness of the search. He is in his mid-forties and, from his courtroom demeanor as well as his testimony, he appears to be of at least average intelligence. He testified that he is familiar with the criminal justice system and, as indicated, knew he could refuse consent. (Tr. 78, 83).

For this and the other reasons stated, defendant's voluntary consent sustains the legality of the search of his vehicle. This ground alone provides sufficient basis for denial of defendant's motion to suppress.

## C. Reasonable Suspicion for Detention and Probable Cause for Search

In addition, as indicated, the search may be upheld as valid on the grounds that there was reasonable suspicion to detain defendant for a canine sniff of his vehicle, which in turn produced probable cause to search it. These issues are discussed directly below.

### 1. Reasonable Suspicion for Detention

Although use of a narcotics canine is not a search within the meaning of the Fourth Amendment, because an individual must be detained while he awaits the canine sniff of his property, such detention must be supported by reasonable suspicion. *United States v. Foreman*, 369 F.3d 776, 781 (4th Cir. 2004). Reasonable suspicion is somewhat less than probable cause, but it "does require a 'minimal level of objective justification' for the police action" *Id.* (quoting *Wardlow v. Illinois*, 528 U.S. 119, 123 (2000)). The court must look at the totality of the circumstances to determine whether reasonable suspicion is present at the time the officer detains a defendant to perform the canine sniff. *Id.* at 785. In making this determination, the court must draw its conclusions from the viewpoint of a reasonable, experienced law enforcement officer. *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (in determining reasonable suspicion, courts must consider law enforcement officers' "experience and specialized training to make inferences from and deductions about the cumulative information available to them.")

Here, as discussed, DiGiovanni is an officer with twenty years of experience. (Tr. 7). In addition, he has significant training in identifying drug activity. (*Id.*).

DiGiovanni testified that a number of facts taken together led to his suspicion that defendant had contraband in his vehicle. First, the information on defendant's Jamaican driver's license appeared off-center, indicating that it might be fraudulent. (Tr. 10, 51). In fact, of course, the license

16

was later determined to be in the name of an alias. In addition, DiGiovanni testified that several factors common to drug couriers were present. (*Id.* 15, 52). Specifically, defendant's vehicle was rented by someone other than defendant and was a one-way rental; defendant appeared to have engaged in undelayed travel, meaning he made no significant stops on his trip;[7] defendant was driving on I-95, a main drug corridor; and defendant had driven through the night. (*Id.*).

Additionally, DiGiovanni noted that defendant had driven from New York City, a known source city for illegal narcotics. (*Id.* 15). Defendant argued that the car he drove was not actually rented in New York City, but in Westchester County, New York. (*Id.* 94). Westchester County, however, is just outside New York City. (*Id.* 34). Moreover, defendant indisputably told DiGiovanni that he had been staying in the Bronx for the six weeks prior to renting the vehicle. (Video, 07:24:26; Tr. 12, 71-72).

Another factor which led to DiGiovanni's suspicion was defendant's hesitation when asked about his age. (*Id.* 15, 52-53). While defendant was admittedly tired, the delay in providing such a basic fact could reasonably be deemed suspicious, especially in light of the suspicious Jamaican driver's license. In his report, although not in his testimony, DiGiovanni also found suspicious defendant's inability to identify readily his address in the Bronx after his extended stay there. (Police Report, p. 1)

Finally, although DiGiovanni testified that defendant appeared overly nervous during the traffic stop (*id.* 15, 43), he also testified that defendant was calm when he consented to the search

---

[7]DiGiovanni based this determination, in part, on the fact that defendant had traveled the approximately 600 to 700 miles from the New York City area to Johnston County in the thirteen hours between the time defendant's car was rented and the time of the traffic stop. (Tr. 37, 63). DiGiovanni also pointed to the presence of food in defendant's car. (*Id.* 62). At the hearing, defendant testified that he had food with him because of his special dietary requirements as a vegetarian. (*Id.* 71). However, this basis for defendant's having the food was not disclosed to DiGiovanni prior to the search.

17

of his vehicle (*id.* 41). This contradiction in testimony leads the court to give little weight to defendant's alleged nervousness as a valid basis for reasonable suspicion.

Notwithstanding this determination, the court finds that the factors relied upon by DiGiovanni, when viewed collectively, are more than sufficient to establish reasonable suspicion for defendant's brief detention during the canine sniff. Although defendant argued at the hearing that any of these factors, standing alone, was not illegal and could apply to many innocent travelers, the law and common sense dictate that they be considered together. *See United States v. Foreman,* 369 F.3d 776 (4th Cir. 2004) (combination of factors, taken together, established reasonable suspicion of criminal activity to justify detention of motorist during canine sniff following a traffic stop); *United States v. Brugal,* 209 F.3d 353 (4th Cir. 2000) (court looked at totality of circumstances and found that reasonable suspicion of criminal activity existed to justify detention of motorist beyond the reasons for a sobriety checkpoint).

### 2. Probable Cause for the Search

A drug detection canine's alert to the trunk of a vehicle establishes probable cause for a hands-on search of the trunk. *Illinois v. Caballes,* 543 U.S. 405, 409 (2005). In this case, DiGiovanni did a brief initial look inside and around the vehicle to ensure there were no items that would harm his drug detection canine, Reno. (Video, 07:34:26; Tr. 18). DiGiovanni then retrieved Reno from his patrol car and walked the dog around defendant's vehicle. (*Id.*, 07:35:30). Reno alerted to the trunk of the vehicle by asserting aggressive behavior and becoming more focused on that area. (Tr. 19). At this point, based on Reno's alert to the trunk, DiGiovanni had probable cause to search the trunk and all the luggage inside. *See United States v. Carter,* 300 F.3d 415, 422 (4th Cir. 2002) (drug detection canine's alert to trunk of vehicle gave police probable cause to search

18

closed suitcase inside trunk). However, DiGiovanni went one step further in his attempt to establish probable cause when he opened the trunk and placed Reno inside. (*Id.* 20). Reno alerted to all of the luggage in the vehicle. (*Id.*). This further alert to the luggage merely bolsters the finding of probable cause to search the luggage in the trunk.

The numerous small plastic bags were not, of course, found in the trunk of defendant's car, but rather the passenger area, to which Reno did not specifically alert. (*See* Police Report, p. 2; Video, 07:56:53). It appears that in the absence of such an alert to the passenger area the canine sniff could not have established probable cause to search that area.[8] *Carter*, 300 F.3d at 422. Irrespective of that issue, the discovery of the guns and marijuana in the trunk did provide probable cause to search other areas of the car, including the passenger area. *See United States v. Haley*, 669 F.2d 201, 204 (4th Cir. 1982) (strong odor of marijuana emitting from a stopped vehicle, along with discovery of a small bag of marijuana in passenger area, gave law enforcement officer probable cause to believe that additional contraband would be found in the trunk, justifying his search of the trunk). A driver traveling under the circumstances presented here who is found to have guns and drugs in his trunk could reasonably be expected to have placed drugs and related contraband elsewhere in the car. Similarly, although the search of the passenger area may have preceded discovery of the guns and did precede discovery of the marijuana, the passenger area would inevitably have been searched after the guns and marijuana were found, if it had not been searched beforehand. *See Nix v. Williams*, 467 U.S. 431, 449-50 (1984) (defendant's statements about the location of his murder victim's body, although procured in violation of *Miranda*, were nevertheless admissible because

---

[8]Defendant did not, of course, limit his consent to any area of the car. (*See* Video, 07:34:00). The location of the plastic bags in the passenger compartment is therefore immaterial under the consent theory for the search.

19

search parties would have inevitably found the body); *see also United States v. George*, 971 F.2d 1113, 1121-22 (4th Cir. 1992) (case remanded to the district court to determine whether evidence seized from the trunk of a vehicle pursuant to a defective search warrant would have been inevitably found in a vehicle inventory search).[9] Accordingly, probable cause establishes an independent basis for the search of defendant's vehicle and denial of his motion to suppress.

## IV. CONCLUSION

For the foregoing reasons, it is RECOMMENDED that defendant's motion to suppress be DENIED.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have ten business days to file written objections. Failure to file timely written objections bars an aggrieved party from receiving a de novo review by the District Judge on an issue covered in the Memorandum and Recommendation and, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Judge.

SO ORDERED, this the 8th day of May, 2007.

James E. Gates
United States Magistrate Judge

---

[9] The bags might also have been subject to seizure on the ground that a lawful inventory search of the vehicle following defendant's arrest would likely have revealed them, but the record lacks evidence regarding what, if any, inventory search practices applied to the vehicle. *See Colorado v. Bertine*, 479 U.S. 367, 369 (1987) (once the driver of a vehicle is taken into custody, any evidence found during a lawful inventory search of the vehicle is admissible against the driver).

20